# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

CAITLIN MURRAY, Derivatively on Behalf
of Nominal Defendant AVANTOR, INC.,

        Plaintiff,

   v.

MICHAEL STUBBLEFIELD, R. BRENT
JONES, JONATHAN PEACOCK, STEVEN
ECK, GREGORY L. SUMME, JUAN
ANDRES, JOHN CARETHERS, LAN KANG,
EMMANUEL LIGNER, DAME LOUISE
MAKIN, JOSEPH MASSARO, MALA
MURTHY, and MICEHAEL SEVERINO,

        Defendants,

   and

AVANTOR, INC.,

        Nominal Defendant.

Case No. _____

JURY TRIAL DEMANDED

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Caitlin Murray ("Plaintiff"), by and through her undersigned attorneys, brings

this derivative complaint for the benefit of nominal defendant Avantor, Inc. ("Avantor" or the

"Company" or "Nominal Defendant"), against its Board of Directors (the "Board") and certain

of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches

of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon

personal knowledge as to herself and her own acts, and information and belief as to all other

matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

which included, among other things, a review of the Company's publicly available documents,

conference call transcripts and public announcements, United States Securities and Exchange

Commission ("SEC") filings, press releases published by and regarding Avantor, legal filings, news reports, securities analysts' reports about the Company, filings in the consolidated securities class action captioned *In re Avantor, Inc. Securities Litig.*, Case No. 2:25-cv-06187 (E.D. Pa.) (the "Securities Class Action"), and other publicly available information. Plaintiff further believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Avantor against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least March 5, 2024, and October 28, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Avantor is a laboratory supply company based in Pennsylvania. In 2017, Avantor acquired the laboratory supply distributor VWR Corporation ("VWR"), combining Avantor's manufacturing expertise with VWR's global distribution and service footprint. Avantor emphasized that its merger with VWR would accelerate growth across life sciences and advanced technology end markets.

3.      To manage the newly acquired comprehensive global distribution network, Avantor developed a set of proprietary operating practices and procedures called the Avantor Business System ("ABS"). The Company repeatedly touted its use of ABS to improve its service levels, accuracy, and cost efficiency through the use of scaled automation, artificial intelligence ("AI"),

---

[1] The Individual Defendants are Michael Stubblefield ("Stubblefield"), R. Brent Jones ("Jones"), Jonathan Peacock ("Peacock"), Steven Eck ("Eck"), Gregory L. Summe ("Summe"), Juan Andres ("Andres"), John Carethers ("Carethers"), Lan Kang ("Kang"), Emmanuel Ligner ("Ligner"), Dame Louise Makin ("Makin"), Joseph Massaro ("Massaro"), Mala Murthy ("Murthy"), and Michael Severino ("Severino"). "Defendants" means Avantor and the Individual Defendants.

and tightened operating discipline. However, the ABS strategy was insufficient to overcome the many issues that Avantor faced in its newly acquired distribution business.

4.    Throughout the Relevant Period, the Individual Defendants misled investors by failing to disclose, *inter alia*, that: (i) Avantor had severely underinvested in its supply chain infrastructure, inventory management systems, and customer service; (ii) Avantor's lack of investment caused delayed and only partial order fulfillment of critical lab products for key customers; (iii) these issues resulted in customer attrition and loss of market share; (iv) the goodwill ascribed to Avantor's acquisition of VWR was materially overstated; and (v) the positive statements about the ABS strategy, competitive positioning, inventory management, customer service, and business prospects were materially false and misleading.

5.    The truth about the Company's supply chain failures and loss of customers began to emerge on April 25, 2025, when Avantor issued a press release discussing its financial results for the first quarter of fiscal year 2025, attached as an exhibit to a Form 8-K filed with the SEC (the "1Q25 Press Release"). In the 1Q25 Press Release, the Company reported weak quarterly results and announced it was cutting its full-year financial outlook. On the same day, the Company held an earning call for investors and analysts (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, the Company announced it was "improving data accuracy, accelerating fulfillment speeds, and optimizing inventory" to drive growth and combat the poor financial results of the first quarter. Also, during the 1Q25 Earnings Call, Defendant Stubblefield announced it was "the right time to initiate a transition in Avantor's leadership," announcing his intention to resign as Chief Executive Officer ("CEO") of Avantor once a successor was found.

6.    On this news, the Company's stock price fell $2.57 per share, or approximately 16.6%, from a closing price of $15.50 per share on April 24, 2025, to a closing price of $12.93 per share on April 25, 2025.

7.    The truth continued to emerge on August 1, 2025, when Avantor hosted an earnings call for investors to discuss its financial results for the second quarter of fiscal year 2025 (the "2Q25 Earnings Call), wherein the Company revealed that maintenance overruns and subsequent facility downtime at several plants coupled with raw material availability and equipment uptime issues forced the Company to defer shipments into the second half of the quarter. The Company estimated that channel recovery would take multiple quarters, possibly doubling the two- to three-month order-to-delivery cycle for critical customer needs. The Company also further reduced its 2025 financial forecasts, stating that it did not expect the competitive environment to materially improve in remainder of 2025.

8.    On this news, the Company's stock price fell $2.08 per share, or approximately 15.5%, from a closing price of $13.44 per share on July 31, 2025, to a closing price of $11.36 per share on August 1, 2025.

9.    The truth was fully revealed on October 29, 2025, when Avantor reported a $712 million net loss for the third quarter of 2025. During an earnings call hosted for investors the same day (the "3Q25 Earnings Call"), Defendant Jones noted that "[Avantor] continue[s] to face other operational headwinds that are impacting our throughput, including raw material availability and equipment uptime." The Company admitted that inventory challenges were caused by a need to improve data accuracy, fulfillment speed, on-time performance, and targeted plant upgrades to address reliability at aging sites. The Company also reported non-cash goodwill impairment charge of $785 million, due, in part, to the loss of several large accounts to a major competitor.

10.    On this news, the Company's stock price fell $3.50 per share, or approximately 23.2%, from a closing price of $15.08 per share on October 28, 2025, to a closing price of $11.58 per share on October 29, 2025.

11.    As set forth herein, the Individual Defendants breached their fiduciary duties by

issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material facts to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) Avantor had severely underinvested in its supply chain infrastructure, inventory management systems, and customer services; (ii) Avantor's paltry investments in these systems caused order delays and partial order fulfillments of the Company's lab products for key customers; (iii) as a result of the issues related to the lack of proper investments, the Company experienced customer attrition and loss of market share to competitors; (iv) Avantor significantly overstated the goodwill assigned to its VWR acquisition; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

12.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Stubblefield, Jones, Peacock, and Eck in the United States District Court for the Eastern District of Pennsylvania, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

13.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Avantor's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff

did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Nominal Defendant is headquartered in this District; Defendants conduct business in this District; a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District; Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District; and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

20.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Avantor.

*Nominal Defendant*

21.     Nominal Defendant is incorporated under the laws of Delaware with its principal executive offices located at Radnor Corporate Center, Building One, Suite 200, 100 Matsonford Road, Radnor, Pennsylvania 19087. Avantor's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AVTR."

*Individual Defendants*

22.     Defendant Stubblefield served as President, Chief Executive Officer ("CEO"), and director of the Company from 2014 to August 18, 2025. According to the proxy statement filed by the Company on a Schedule 14A with the SEC on March 28, 2025 (the "2025 Proxy"), Stubblefield received $14,525,638 in total compensation from the Company in 2024.

23.     Defendant Jones has served as the Company's Executive Vice President ("VP") and Chief Financial Officer ("CFO") since August 2023. According to the 2025 Proxy, Jones received $3,886,451 in total compensation from the Company in 2024.

24.     Defendant Peacock served as a director of the Company from 2017 to December 31, 2025, and as Chair of the Board from May 2022 to December 31, 2025. According to the 2025 Proxy, Peacock received $482,475 in total compensation from the Company in 2024.

25.     Defendant Eck has served as the Company's Senior VP and Chief Accounting Officer ("CAO") since April 2019.

26.     Defendant Summe has served as a director of Avantor since May 2020 and as Chair of the Board since January 2026. Summe also serves as the Chair of the Company's Nominating & Governance Committee and as a member of the Company's Compensation & Human Resources

Committee. According to the 2025 Proxy, Summe received $329,975 in total compensation from the Company in 2024.

27.     Defendant Andres has served as a director of Avantor since September 2019. Andres also serves as Chair of the Company's Science & Technology Committee and as a member of the Company's Audit & Finance Committee. According to the 2025 Proxy, Andres received $317,475 in total compensation from the Company in 2024.

28.     Defendant Carethers has served as a director of Avantor since July 2021. Carethers also serves as a member of the Company's Nominating & Governance Committee and Science & Technology Committee. According to the 2025 Proxy, Carethers received $312,475 in total compensation from the Company in 2024.

29.     Defendant Kang has served as a director of Avantor since April 2021. Kang also serves as a member of the Company's Compensation & Human Resources Committee. According to the 2025 Proxy, Kang received $314,975 in total compensation from the Company in 2024.

30.     Defendant Ligner has served as President, CEO, and director of the Company since August 2025.

31.     Defendant Makin has served as a director of Avantor since November 2024. Makin also serves as a member of the Company's Audit & Finance Committee and Nominating & Governance Committee. According to the 2025 Proxy, Makin received $122,536 in total compensation from the Company in 2024.

32.     Defendant Massaro has served as a director of Avantor since November 2021. Massaro also serves as the Chair of the Company's Audit & Finance Committee. According to the 2025 Proxy, Massaro received $329,975 in total compensation from the Company in 2024.

33.     Defendant Murthy has served as a director of Avantor since October 2021. Murthy also serves as a member of the Company's Audit & Finance Committee. According to the 2025

Proxy, Murthy received $317,475 in total compensation from the Company in 2024.

34.   Defendant Severino has served as a director of Avantor since April 2020. Severino also serves as Chair of the Company's Compensation & Human Resources Committee and as a member of the Company's Science & Technology Committee. According to the 2025 Proxy, Severino received $324,975 in total compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.   By reason of their positions as officers and/or directors of Avantor, and because of their ability to control the business and corporate affairs of Avantor, the Individual Defendants owed Avantor and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Avantor in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Avantor and its shareholders.

36.   Each director and officer of the Company owes to Avantor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Avantor, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.   To discharge their duties, the officers and directors of Avantor were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.   Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Avantor, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Avantor were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Avantor were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Pennsylvania and the United States, and pursuant to Avantor's own Global Code of Ethics and Conduct (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (iii)    Remain informed as to how Avantor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Avantor and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Avantor's operations would comply with all applicable laws and Avantor's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.     Each of the Individual Defendants further owed to Avantor and the shareholders the duty of loyalty requiring that each favor Avantor's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Avantor and were at all times acting within the course and scope of such agency.

44.     Because of their advisory, executive, managerial, and directorial positions with Avantor, each of the Individual Defendants had access to adverse, non-public information about the Company.

45.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Avantor.

### AVANTOR'S CODE OF CONDUCT

46.     The Company describes its Code of Conduct as representing "the principles that guide Avantor and our associates in conducting business ethically so that we can achieve our vision and set science in motion to create a better world."

47.     The Code of Conduct "applies to Avantor, including all of its global affiliates and subsidiaries . . . . It governs the conduct of Avantor associates and officers, members of the Board of Directors and third parties engaged in business with Avantor worldwide."

48.     Under a heading titled "Leading By Example Under The Code," the Code of Conduct states, in relevant part:

> Managers and leaders are expected to act ethically and have additional responsibility to ensure that Avantor provides an environment that promotes ethical behavior. It is your responsibility to:
>
> -   Promote ethical business conduct every day and lead by example

- Make sure all associates, especially those who report to you, know and understand this Code [of Conduct], our policies, and the laws that apply to their positions
- Create an atmosphere in which your team feels comfortable asking questions and reporting concerns
- Understand your area of responsibility and ensure appropriate controls are in place to mitigate risk . . . .

49.    Under a heading titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

Objectivity is necessary to make good business decisions. When an associate's personal interests or activities, or even those of a family member or close personal acquaintance, intersect with their business decisions, a conflict of interest can arise. Avantor defines a conflict of interest as a situation when personal interests or personal activities could compromise, or appear to compromise, an associate's objectivity, impairing their ability to make good business decisions on behalf of Avantor

Associates must avoid conflicts of interest . . . . Associates may not proceed with any business transaction that poses or even appears to pose an actual or potential conflict of interest under this Code [of Conduct] . . . .

EXAMPLES OF CONFLICTS OF INTEREST

**Personal relationships**
The objectivity to make good business decisions becomes difficult when personal considerations are involved, such as when customers, suppliers or competitors are close personal acquaintances or family members . . . .

**Financial interests**
Investing in a company that Avantor does business with or competes against can result in a direct conflict between your own financial interests and Avantor's best interests . . . .

**Corporate opportunity**
Using for a personal benefit or diverting a business opportunity in which Avantor might reasonably expect to be interested, without first making the opportunity available to Avantor, is prohibited. All associates have a duty to advance Avantor's business interests whenever the opportunity arises.

50.    Under a heading titled "External Communications, Including Social Media," the Code of Conduct states, in relevant part:

Proper and thoughtful communication of Avantor's information is critical for driving and/or protecting our brand. As a result, Avantor has designated specified associates as authorized spokespersons. These associates have been trained in delivering accurate and approved information to the appropriate audience they are addressing . . . .

We can only publicly disclose Avantor's financial information under certain conditions. As a result, only authorized associates can speak to members of the financial community or Avantor's investors on behalf of Avantor . . . .

All rules and policies that apply to the protection of confidential information, including this Code [of Conduct], also apply to all social media activities; disclosure of confidential information concerning Avantor, customers, suppliers or other third parties are prohibited.

51.     Under a heading titled "Insider Trading," the Code of Conduct states, in relevant part:

Avantor's policies and applicable securities laws prohibit buying or selling a company's securities (including stock, options, debt securities, derivatives, etc.) based on material non-public information or providing such information to others so that they may buy or sell a company's securities. Avantor's policy applied to associates, directors, consultants and contractors, as well as their family members and other members of their household, friends, and other individuals.

Material non-public information is information that is not known or generally available to the public and that is likely to be important in deciding whether to buy, hold or sell securities. This Code [of Conduct] and its related policies cannot identify every type of material non-public information, but typical categories include projections of future earnings or losses; financial results and changes from expected financial results; pending or proposed mergers, acquisitions, securities or debt offerings; sales of assets or financing arrangements; changes in management; financial or liquidity problems; litigation or investigations; major contract wins or loses; and significant write-downs of assets or additions to reserves.

Avantor's policies prohibit trading in Avantor's securities or the securities of those companies that we do business with, including customers, suppliers, competitors and potential acquisition targets based on material non-public information.

Further, you are prohibited from providing material non-public information to others so that they may buy or sell Avantor's securities or the securities of the companies we do business with, even if you will not benefit from the trading activity.

Avantor prohibits speculative or hedging transactions in Avantor's securities, and like Avantor's other important information assets, the disclosure of material non-public information to third parties is not permitted.

52.     Under a heading titled "Accurate Books, Records, Disclosure and Internal

Accounting Controls," the Code of Conduct states, in relevant part:

Avantor expects, and the law requires, all associates to record and report information accurately and honestly. This includes accurate reporting of time worked, business expenses incurred, accounting entries and information, production data, safety records and any other information related to business activities. Associates should use good judgement and common sense when preparing any business records to ensure they objectively and accurately reflect the facts of the situation.

In general, all internal and external financial records and information must follow the applicable generally accepted accounting principles and effective internal controls, including procedures in place to protect Avantor's assets. No entry may be made in Avantor's records that intentionally hides or disguises the true nature of any transaction. All funds and assets must be accurately recorded and disclosed in Avantor's books and records, and no undisclosed or unrecorded funds or assets may be established. Avantor should not be party to any transaction if we are uncomfortable with how the other party may account for the transaction in its books and records unless confirmed with the Legal and Compliance department (and accounting or tax as the case may be).

Budget proposals and other financial evaluations and forecasts must fairly represent all relevant information. All business transactions must be properly authorized and completely and accurately recorded in Avantor's financial records, in accordance with appropriate policies and procedures. Familiarity and compliance with Avantor's accounting and reporting policies and systems of internal controls are required at all times.

Avantor is committed to providing timely consistent and accurate information according to applicable legal and regulatory requirements. We meet this commitment by requiring the review and approval of financial and related information before it is disclosed.

53.     Under a heading titled "'Ethical Business Relationships," the Code of Conduct

states, in relevant part:

Avantor is committed to ethical behavior in all of our business interactions, including with investors, customers, suppliers and the other companies we work with. Using good judgement in our business relationships helps Avantor to avoid even the appearance of inappropriate conduct.

## AVANTOR'S AUDIT AND FINANCE COMMITTEE CHARTER

54.     Avantor's Audit and Finance Committee Charter (the "Audit Committee Charter")

states that the Committee's purpose is:

A.  [To] provide assistance to the Board of Directors . . . of Avantor, Inc. (the "Company") with respect to its oversight of:

(1) the quality and integrity of the Company's financial statements, including the oversight of the Company's accounting and financial reporting and other internal control processes;
(2) the qualifications, performance and independence of the Company's independent registered public accounting firm;
(3) the Company's compliance with legal and regulatory requirements;
(4) the performance of the Company's internal audit function; and
(5) the Company's financial and treasury policies and strategies, including its capital structure.

B.  [To] prepare and audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

55.     The Audit Committee Charter also lists certain responsibilities of the Audit and

Finance Committee, stating, in relevant part:

Documents/Reports Review

1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall determine whether to recommend to the Board to include the audited financial statements in the Company's annual report on Form 10-K . . . .

Accounting and Financial Reporting Process

11. In consultation with the independent registered public accounting firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's financial reporting processes. In that connection, the Committee must obtain, review and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

(i) all critical accounting policies and practices to be used by the Company;

(ii) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements, and the treatment preferred by the independent registered public accounting firm;

(iii) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

[iv] major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies . . . .

Legal and Compliance and Risk Oversight

17. Periodically review and discuss with the Company's General Counsel any legal, regulatory, and compliance matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements, including any material reports or inquiries from regulatory or governmental agencies.

18. Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management. The Committee should discuss the Company's major financial and operational risk exposures and the steps management has taken to monitor and control such exposures . . . .

21. Oversee, review and periodically update the Company's Code of Conduct and Ethics (the "Code") (including review of requests of waivers thereof by executive officers and directors) and the Company's system to monitor compliance with and enforce the Code, including the Company's Whistleblower Policy . . . .

Oversight of Financial Policies, Strategies and Capital Structure . . . .

24. To the extent that it deems appropriate, review the terms and conditions of material financing plans, including the issuance of securities, corporate borrowings, securities repurchases and dividend policy, and make recommendations to the Board of Directors on such financing plans . . . .

26. Review and approve at least on an annual basis, the decisions by management to enter into derivative transactions on a cleared or non-cleared basis, and the

policies and processes of the Company related thereto, and review and recommend to the Board on matters pertaining to the Company's derivative transactions and hedging strategy.

<u>Reports</u>

27. Prepare the Audit Committee report required by the SEC to be included in the Company's annual proxy statement.

28. Report regularly to the Board of Directors including:

(i) with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualifications, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;

(ii) following meetings of the Committee; and

(iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities.

The Committee will provide such recommendations to the Board of Directors as the Committee may deem appropriate. The report to the Board of Directors may take the form of an oral report by the Chairperson or any other member of the Committee designated by the Committee to make such report.

29. Maintain minutes or other records of meetings and activities of the Committee.

## **SUBSTANTIVE ALLEGATIONS**

*Background*

56.    Avantor is laboratory supply company, providing products and services to customers in the biopharma, healthcare, education and government, and advanced technologies and applied materials industries. Avantor reports financial results in two segments: Laboratory Solutions ("LS") and Bioscience Production ("BP"). As of 2024, the BP segment accounted for thirty-two percent of the Company's net sales, whereas the LS segment accounted for sixty-eight percent of net sales. Within the LS and BP segments, Avantor sells materials, consumables, equipment, instrumentation, services, and specialty procurement to customers in different

industries.

57.    In November 2017, Avantor acquired the laboratory supply distributor VWR for approximately $6.4 billion, which included debt financing. Avantor, under relevant accounting rules, reported "goodwill" on its balance sheet in connection with the VWR acquisition, representing the excess of the VWR purchase price over the fair value of VWR's identifiable net assets. When a company purchases another company, paying more than net fair value, the excess is often recorded as goodwill, an intangible asset reflecting things like the acquired company's reputation, workforce skills and knowledge, expected synergies, and other assets not individually accounted for. Once a company reports goodwill, they typically have a continuous obligation to write down the goodwill value ascribed to the acquisition. Thus, Avantor had a continuous obligation to write down on its balance sheets the goodwill value ascribed to VWR for the premium paid for VWR. By the start of the Relevant Period, Avantor reported goodwill, net of accumulated impairments (the "Net Goodwill"), of $5.7 billion.

58.    Prior to Avantor's acquisition of VWR, Avantor was primarily a manufacturer of laboratory products. However, through the acquisition, Avantor took over VWR's laboratory supply distribution business, transforming Avantor into a global distribution platform with 200 manufacturing and distribution facilities serving over 300,000 customers across approximately 180 countries with millions of products. To manage this complex supply chain, Avantor developed proprietary practices and procedures called ABS. ABS was designed to keep operations lean while maintaining high service levels in order to drive profitable growth and customer satisfaction.

59.    However, despite Avantor touting its use of ABS to improve service levels, accuracy, and cost efficiency through scaled automation, AI, and tightened operation discipline, Avantor faced multiple supply chain failures and customer defections throughout the Relevant Period. Yet, throughout the Relevant Period, Avantor did not disclose these issues related to its

acquisition with VWR to shareholders or the public.

***Materially False and Misleading Statements***

60.    On March 5, 2024, representatives of the Company participated in a fireside chat

at the TD Cowen Health Care Conference (the "TD Cowen Conference"). During the TD Cowen

Conference, Defendant Stubblefield responded to a question about the benefits of Avantor's new

reporting structure, stating, in relevant part:

> I think this is a much better way to run the business . . . aligning our business this
> way does focus us uniquely on what our customers are doing and ***allows us to better
> align our innovation portfolios or our offerings, and it should lead to enhanced
> growth and margin expansion over time.***[2]

61.    At the same TD Cowen Conference, Defendant Stubblefield also spoke about the

LS business and its trajectory, stating, in relevant part:

> I think as we look at that segment, first of all, it gives us ***unparalleled access to our
> customers, and we leverage that access across more than 300,000 locations to
> seed the content that ultimately gets specked in for our Production segment***. And
> that's an important part of that platform. But on its own, it's a great business.
>
> We think there's some opportunities to accelerate growth by focusing on the high-
> growth workflows that are in that space. We think ***there's an opportunity to
> continue to enhance the level of proprietary content in that platform, which will
> not only help with the top line, but will also help with margin expansion***. And
> ***we'll continue to invest aggressively not only in the physical infrastructure to
> maintain the service levels that our customers have come to expect from us***, but
> also in the digital infrastructure that can create so many efficiencies and further
> ingrain us in our customers' workflows.

62.    When asked about Avantor's competitive positioning in its LS business during the

TD Cowen Conference, Defendant Stubblefield emphasized that Avantor's competitive position

"[c]ontinues to be strong," and stated, in relevant part:

> We had a really terrific year in 2023. ***The commercial intensity has ramped up on
> this platform dramatically, I would say, over the last 12 to 18 months***. And we've
> seen meaningful signs of that. We grew our academia position last year, high single

---

[2] Unless otherwise stated, all emphasis is added.

digits, low double digits, a really terrific year where we were clearly taking share another really strong year in biopharma with a lot of new customers and extensions of some important agreements there.

So *we continue to have confidence in the positioning [of] a lot of investments in our digital capabilities there* to make it more efficient for our customers to engage with us, minimize the time that they're spending on some of these more administrative tasks.

And if I look at just some proof point there, the traffic to our sites relative to our competitors is a nice indicator for our business. And then *some of the solutions that we've deployed into our customers, whether it be some of the auto replenishment tools that we've deployed, or some of the inventory management tools that we've deployed, just a lot of momentum that we have off of that platform*. So we like the set up the activity is good, and we do anticipate a bit of growth this year.

63.    On March 20, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). In the 2024 Proxy, the Company discussed the corporate governance practices of its Board and the Board's oversight strategy, stating, in relevant part:

The Board is deeply engaged and involved in overseeing the Company's long-range strategy, including evaluating key market opportunities, customer and supplier trends and competitive developments. This also includes aspects of our ESG initiatives that relate to our strategy. The Board's oversight of risk is another integral component of the Board's oversight and engagement on strategic matters. Strategy-related matters are regularly discussed at board meetings and, when relevant, at Committee meetings. We also dedicate at least one board meeting every year to an even more intensive review and discussion of the Company's strategic plan. Matters of strategy also inform committee-level discussions of many issues, including enterprise risk. Engagement of the Board on these issues and other matters of strategic importance continues in between meetings, including through updates to the Board on significant items and discussions between the CEO and our Chairman on a periodic basis. Each director is expected to bring to bear their own talents, insights, and experiences to these strategy discussions.

64.    The 2024 Proxy also discussed the Board's and management's role in risk oversight, stating, in relevant part:

While senior management has primary responsibility for managing risk, the Board has responsibility for risk oversight with specific risk areas delegated to relevant Board committees who report on their deliberations to the full Board. The specific risk areas of focus for the Board and each of its committees are summarized below.

Board of Directors

- Oversee the Company's risk governance framework, including an enterprise-wide culture that supports appropriate risk awareness, identification, escalation and management of risk
- Integrity, ethics and compliance with its Code of Ethics and Conduct
- General strategic and commercial risks
- M&A transactions, including execution and integration, and the M&A competitive landscape
- Legal risks such as those arising from litigation, environmental and intellectual property matters

Audit and Finance Committee
- Oversee and coordinate with the Company's internal and external auditors
- Accounting, controls and financial disclosures
- Oversee the Company's Enterprise Risk Management (ERM) program
- Cybersecurity risk, including our information security framework, threat assessment, response readiness and training efforts
- Tax and liquidity management . . . .

Nominating and Governance Committee
- Governance structures and processes
- Board organization, independence and structure
- Board succession and effectiveness
- Oversee the Company's ESG initiatives

Management
- Identification, assessment and management of risks through enterprise risk management program

**Enterprise Risk Management[3]**

The Board uses the ERM program as a key tool for understanding the inherent risks facing Avantor and assessing whether management's processes, procedures and practices for mitigating those risks are effective. The ERM assessment is led by our executive leadership team and based on an enterprise-wide "top down" and "bottom up" view of commercial, strategic, legal, compliance, human capital, cyber, and reputational risks and strategies for mitigating those risks. In 2023, the ERM program included consideration of risks in nine distinct risk categories and 17 key risks overall. Each risk was the subject of an intensive risk workshop and those deemed to be the highest risk are receiving additional ongoing oversight by the executive team.

Both the Audit and Finance Committee and the Board review the results of the annual ERM assessment. During the reviews, Avantor's Chief Accounting Officer and General Counsel present the results of the ERM assessment in a manner

---

[3] Emphasis in original.

designed to provide full visibility into the risks facing Avantor and how management is mitigating those risks, thereby enabling the Board to effectively exercise its oversight function. To facilitate continued monitoring and oversight by the Board, key risk areas identified during the ERM process and management's associated mitigation activities become part of Board and/or committee meeting agendas for the following year.

65.     On April 26, 2024, the Company filed a Form 10-Q with the SEC disclosing the Company's financial results for the first quarter of fiscal year 2024 (the "1Q24 10-Q"). In the 1Q24 10-Q, the Company incorporated by reference certain statements from its Form 10-K filed with the SEC for the fiscal year ended December 31, 2023 (the "2023 10-K"), stating "Quantitative and qualitative disclosures about market risk appear in Item 7A in the Company's [2023 10-K]. There were no material changes during the quarter ended March 31, 2024 to this information as reported in the Company's [2023 10-K]."

66.     The 2023 10-K contained risk factors concerning Avantor's reliance on sole or limited sources, exposure to input availability and pricing, and dependence on suppliers' abilities to meet specifications and delivery schedules, stating, in relevant part:

> If we are unable to manufacture our products consistently, in sufficient quantities, and on a timely basis, our net sales, gross margins and our other operating results will be materially and adversely affected. In addition, we have experienced problems with, or delays in, our production, shipping and logistics capabilities that have resulted in delays in our ability to ship finished products, and there can be no assurance that we will not encounter such problems in the future. ***Significant delays in our manufacturing, shipping or logistics processes could damage our customer relationships, cause disruption to our customers and adversely affect our business, financial condition and operating results*** . . . .
>
> We compete in highly competitive markets. Failure to compete successfully could adversely affect our business, financial condition and results of operations[4] . . . .
>
> Moreover, ***we are dependent upon the ability of our suppliers to provide materials and components that meet our specifications, quality standards, other applicable criteria, and delivery schedules***. Our suppliers' failure to provide expected raw materials or components that meet such criteria could adversely affect production

---

[4] Emphasis removed.

schedules and contract profitability and negatively impact our results of operations
. . . .

We have experienced inventory fluctuations and build up at customers as a result of global supply chain disruptions and have experienced inflationary pressures across all of our cost categories. While **we have implemented pricing and productivity measures to combat these pressures, they may continue to adversely impact our results**.

67.     The 1Q24 10-Q also reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at **$5,762 million** as of March 31, 2024.

68.     The 1Q24 10-Q was signed by Defendant Eck and included certifications signed by Defendants Stubblefield and Jones pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

69.     On the same day, the Company held an earnings call to discuss the financial results for its first quarter of fiscal year 2024 (the "1Q24 Earnings Call"). During his prepared remarks at the 1Q24 Earnings Call, Defendant Stubblefield stated, in relevant part:

During the first quarter, we aligned our organization with the new business segments and initiated several work streams to optimize the Avantor customer experience. Our commercial intensity and the relevance of our workflow solutions resulted in multiple competitive wins and contract renewals with biopharma, healthcare and education and government customers.

As part of our innovation strategy, we enhanced our offerings for cell engineering, gene therapy and synthetic biology applications through supplier partnerships and proprietary innovation. We are seeing strong customer response to recent proprietary new product introductions, including our Viral Inactivation Solutions launched earlier this year and our integrated mixing systems and fluid handling assemblies, which are delivering critical efficiency and quality improvements to our bioprocessing customers. ***We also advanced our multiyear cost transformation initiative, including footprint optimization, organizational efficiency, go-to-market and procurement savings. Our disciplined execution enabled us to accelerate the realization of some savings into the first quarter, contributing to our margin and profitability outperformance***.

70.     During the question-and-answer portion of the 1Q24 Earnings Call, Defendant Stubblefield discussed the LS segment, stating, in relevant part:

[W]e're starting to see some nice acceleration [in the LS segment], which I think is *reflective of the destocking trends that we're seeing and the improvement of inventory health as well as just a good indicator of funding and activity levels, engagement with our customers across the board* . . . .

[W]e're laser-focused on executing our long-term growth strategy, which means we're investing in innovation, new product introductions, strategic marketing, *a lot of investments in our digital platform to position our business for sustained long-term growth and to build on our leading position in both of our segments* . . . .

We continue to see nice growth [in the LS segment], *a nice penetration and a lot of new customer wins there, a lot of important contract renewals*. That's an end market or a customer segment that historically has been a little bit more open to – to churn. I'm not sure we're seeing it any differently now. Maybe we're playing it a bit more aggressively now. But just with the more fixed budget environment and less sensitivity to maybe some of the – the high regulatory environment that a biopharma customer might have. That is an area that we think that we can continue to be successful with.

71.     On May 9, 2024, the Company held the 2024 Annual Meeting of Stockholders of Avantor, Inc. (the "2024 Annual Stockholder Meeting"). During the 2024 Annual Stockholder Meeting, Defendant Peacock discussed the Company's supply chain investments, stating, in relevant part:

[I]n 2023, we earned new and expanded multi-year customer relationships that reflect that value at every stage of the scientific journey from research to commercialization. *We've also made purposeful strategic investments in manufacturing capacity, supply chain innovation and digital capabilities to drive efficiencies and position the company for future growth*. The new operating model was unveiled during our December 2023 Investor Day is designed to enhance operational efficiency and sharpen our focus on further building our Bioscience Production and Lab Solution businesses.

72.     On May 14, 2024, the Company participated in the Bank of America Global Healthcare Conference (the "2024 Bank of America Conference"). During the 2024 Bank of America Conference, Defendant Stubblefield responded to a question about the indispensable purchases from the Company's typical laboratory customers stating, in relevant part:

Just consistent with the rest of our portfolio, these are the necessities of a lab for a scientist to do their work. And if you're outfitting a new lab and you're worried about spend, these are items you can't do without . . . and *so it's great positioning*.

73.    On May 30, 2024, representatives of the Company attended the Sanford C. Bernstein Strategic Decisions Conference (the "Bernstein Conference"). During the Bernstein Conference, Defendant Stubblefield discussed the Company's supply chain logistics, stating, in relevant part:

> We round out our offering to really build complete end-to-end workflow solutions through the partnerships that we have with our critical third-party suppliers, of which we have more than 5,000. To grow this business, we're focused on high-growth workflows, we're focused on innovation, and ***we're an important source of bringing innovation and innovative solutions to our customers in the lab and bringing efficiency and productivity to them through the digital tools that we deploy*** . . . .

> It was an important transition for the company . . . it was really a natural evolution of how we've built out the model. And I think it recognizes the strength and positioning that we have within the laboratory environment as well as within our production capabilities. And ***it's a better alignment of our capabilities with our customers' needs and it brings I think better focus and accountability for us in that regard*** . . . .

> There's a tremendous opportunity here to bring novel therapeutics to treat diseases that have been untreatable up until now. And so, the pipelines are bursting. And whether it's being developed at a biotech startup or a traditional large pharma company, for us, it's really all same. We're providing all of the content that they need to facilitate that research. ***My platform gives me access to all of these labs around the world. And in fact that was the driver for bringing VWR and Avantor together was to be able to give me access to all these disparate labs around the world*** . . . .

> The demographics of the population, chronic diseases and other things, it all provide a macro environment where this business is going to continue to thrive and we're extremely well-positioned. The innovation pipeline here literally has – I don't know what the current number is, but it's well over 500 projects underway here and a rich history of providing new technologies into the space. So, the business model itself, as I mentioned in our presentation, runs exactly like it does for our bioprocessing business. ***So, we would work with the device designers early in their development processes to customize the solution, support them through the regulatory filings, become part of their specification, and then support them at scale in production***. And so, the business model itself is identical. You're really overweighting on our expertise around material science, around purification to produce materials, part-per-billion type levels of impurities. So, the business model itself is part and parcel for what we do. The other thing is it's part of the larger ecosystem. ***So, we're able to leverage the supply chain, the digital, the quality,***

*regulatory capabilities that we use to serve our other platforms. So, there's actually quite some synergies* . . . .

We've got a lot of wood to chop here on 2024 and we'll take the time the next couple of quarters to see how things evolve. It is a dynamic environment. But I think our view still is the same that *these markets will recover over the next one to two years, and we're incredibly well-positioned to take advantage of it when it does*.

74.     On June 11, 2024, representatives of the Company attended the Goldman Sachs Healthcare Industry Conference (the "Goldman Sachs Conference"). During the Goldman Sachs Conference, the Company continued to downplay concerns about Avantor's supply chain logistics, with Defendant Stubblefield stating, in relevant part:

The dynamics are a little bit different in the two segments that we run in our lab segments, which is largely a book and ship type business where *my supply chain is capable of reaching our customers in a 24 to 48-hour period. Orders are coming in and going out, essentially real time and that's kind of the level of visibility that we have in that part of the business*.

Similarly, on the production side of the business, as things have normalized coming out of the pandemic, *our supply chain has reset and we're working off of lead times and order books that are roughly two to three months which is similar to what we had going into the pandemic back in 2019*.

So, we have a bit more visibility there, but not substantially more. And so, that's kind of the defining elements of how we are able to look into the future there. *So, in lab, a few days to a week, on the production side, a few months*.

I would say relative to last year or this year, the visibility hasn't really changed structurally. I would say *as the supply chains improved, things have kind of reset to the way they ran prior to the pandemic, though*.

75.     On July 26, 2024, the Company filed a Form 10-Q with the SEC disclosing the Company's financial results for the second quarter of fiscal year 2024 (the "2Q24 10-Q"). The 2Q24 10-Q reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at *$5,659.6 million* as of June 30, 2024.

76.     The 2Q24 10-Q also incorporated by reference statements made in the 2023 10-K stating that "[q]uantitative and qualitative disclosures about market risk appear in Item 7A in the

Company's [2023 10-K]. There were no material changes during the quarter ended June 30, 2024 to this information as reported in the [2023 10-K]." The 2023 10-K contained the materially false and misleading risk factors identified in ¶ 66, *supra*.

77.     The 2Q24 10-Q was signed by Defendant Eck and included certifications signed by Defendants Stubblefield and Jones pursuant to Section 906 of SOX.

78.     On the same day, the Company held an earnings call to discuss the financial results for its second quarter of fiscal year 2024 (the "2Q24 Earnings Call"). In the opening remarks of the 2Q24 Earnings Call, Defendant Stubblefield told attendees that the Company was "***working with our suppliers to create a more sustainable supply chain***."

79.     On October 25, 2024, the Company filed a Form 10-Q with the SEC disclosing the Company's financial results for the third quarter of fiscal year 2024 (the "3Q24 10-Q"). The 3Q24 10-Q reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at ***$5,670.6 million*** as of September 30, 2024. The 3Q24 10-Q also incorporated by reference the materially false and misleading risk factors identified in ¶ 66, *supra*, stating "[q]uantitative and qualitative disclosures about market risk appear in Item 7A 'Quantitative and qualitative disclosures about market risk' in our [2023 10-K]. There were no material changes during the quarter ended September 30, 2024 to this information as reported in the [2023 10-K]."

80.     The 3Q24 10-Q was signed by Defendant Eck and included certifications signed by Defendants Stubblefield and Jones pursuant to Section 906 of SOX.

81.     On the same day, the Company held an earnings call to discuss the financial results for its third quarter of fiscal year 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Stubblefield discussed the issues revolving around the Company's supply chain operations, stating, "***We continue to improve the efficiency and productivity of our supply chain operations***."

82.     On February 7, 2025, the Company filed a Form 10-K with the SEC disclosing the Company's financial results for the fiscal year ended December 31, 2024. (the "2024 10-K"). The 2024 10-K reported that the Company's total net goodwill was valued at ***$5,539.2 million*** as of December 31, 2024. The 2024 10-K also contained substantially the same materially false and misleading risk factors as the 2023 10-K referenced and identified in ¶ 66, *supra*.

83.     The 2024 10-K was signed by Defendants Andres, Carethers, Eck, Jones, Kang, Makin, Murthy, Peacock, Stubblefield, Summe, and Severino. The 2024 10-K also included certifications signed by Defendants Stubblefield and Jones wherein they certified that all information in the 2024 10-K adhered to Sections 13(a) or 15(d) of the Exchange Act, and that the information fairly represented the financial condition and results of the operations of the Company, pursuant to Section 906 of SOX.

84.     On the same day, the Company held an earnings call to discuss the financial results for its fourth quarter and full fiscal year 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Jones discussed how the Company was "***entering 2025 well positioned for growth***," and that "[t]he implementation of [the Company's] new operating model, the progress of our cost transformation initiatives, and ***encouraging trends we are seeing across key end-markets***, particularly bioprocessing, all give us ***confidence in forecasting organic revenue growth, continued market expansion, and double-digit EPS growth in 2025***." Defendant Jones further projected "organic revenue growth of 1% to 3%," and "low single digit organic growth in Lab Solutions." Defendant Stubblefield similarly stated that the Company "ha[s] a solid plan for the year and I am confident that we will continue to execute well."

85.     On March 27, 2025, the Company published its annual report for 2024 (the "2024 Annual Report"). The 2024 Annual Report discussed Avantor's goodwill and how the Company had reassigned its goodwill, stating, in relevant part:

[W]e reorganized our segment reporting structure effective January 1, 2024. The segment reporting reorganization also resulted in a change to our reporting units for the purpose of goodwill impairment testing. Our new reporting units are Buy Sell Lab, Proprietary Lab, Services, Manufactured Products, Buy Sell Production, and NuSil. As a result of the reorganization, our goodwill was reassigned to the new reporting units making up our Laboratory Solutions and Bioscience Production reporting segments.

We have reassigned goodwill as of January 1, 2024 to align to our new segment structure by using a relative fair value approach as required under GAAP. We tested goodwill for impairment immediately before and after the reorganization of our reporting structure; no impairment was identified.

The following table presents goodwill by our reportable segments, on the effective date of the change:

| | Laboratory Solutions | | Bioscience Production | | Total | |
|---|---|---|---|---|---|---|
| Goodwill, gross | $ | 3,842.0 | $ | 1,913.5 | $ | 5,755.5 |
| Accumulated impairment losses | | (18.4) | | (20.4) | | (38.8) |
| Goodwill, net | $ | 3,823.6 | $ | 1,893.1 | $ | 5,716.7 |

The following table presents goodwill by our reportable segments, on the effective date of the change:

| | December 31, 2024 | | | | | |
|---|---|---|---|---|---|---|
| (in millions) | Laboratory Solutions | | Bioscience Production | | Total | |
| Beginning balance, net | $ | 3,823.6 | $ | 1,893.1 | $ | 5,716.7 |
| Currency translation | | (113.4) | | (5.1) | | (118.5) |
| Divestitures | | (59.0) | | — | | (59.0) |
| Ending balance, net | | 3,651.2 | | 1,888.0 | | 5,539.2 |
| Accumulated impairment losses | | 18.4 | | 20.4 | | 38.8 |
| Ending balance, gross | $ | 3,669.6 | $ | 1,908.4 | $ | 5,578.0 |

86.    On March 28, 2025, the Company filed the 2025 Proxy with the SEC. In the 2025 Proxy, the Company discussed the corporate governance practices of its Board and the Board's oversight strategy, stating, in relevant part:

The Board is deeply engaged and involved in overseeing the Company's long-range strategy, including evaluating key market opportunities, customer and supplier trends and competitive developments. This also includes aspects of our corporate sustainability and governance initiatives that relate to our strategy. The Board's oversight of risk is another integral component of the Board's oversight and engagement on strategic matters. Strategy-related matters are regularly discussed at Board meetings and, when relevant, at Committee meetings. We also dedicate at least one Board meeting every year to an even more intensive review and discussion

of the Company's strategic plan. Matters of strategy also inform committee-level discussions of many issues, including enterprise risk. Engagement of the Board on these issues and other matters of strategic importance continues in between meetings, including through updates to the Board on significant items and discussions between the CEO and our Chairman on a periodic basis. Each director is expected to bring to bear their own talents, insights, and experiences to these strategy discussions.

87.     The 2025 Proxy also discussed the Board's and management's role in risk

oversight, stating, in relevant part:

While senior management has primary responsibility for managing risk, the Board has responsibility for risk oversight with specific risk areas delegated to relevant Board committees who report on their deliberations to the full Board. The specific risk areas of focus for the Board and each of its committees are summarized below.

Board of Directors
- Oversee the Company's risk governance framework, including an enterprise-wide culture that supports appropriate risk awareness, identification, escalation and management of risk
- Integrity, ethics and compliance with its Code of Ethics and Conduct
- General strategic and commercial risks
- M&A transactions, including execution and integration, and the M&A competitive landscape
- Legal risks such as those arising from litigation, environmental and intellectual property matters

Audit and Finance Committee
- Oversee and coordinate with the Company's internal and external auditors
- Accounting, controls and financial disclosure
- Oversee the Company's Enterprise Risk Management ("ERM") program . . . .

Nominating and Governance Committee
- Governance structures and processes
- Board organization, independence and structure
- Board succession and effectiveness
- Oversee the Company's sustainability initiatives

Management
- Identification, assessment and management of risks through ERM program

**Enterprise Risk Management[5]**

---

[5] Emphasis in original.

31

The Board uses the ERM program as a key tool for understanding the inherent risks facing Avantor and assessing whether management's processes, procedures and practices for mitigating those risks are effective. The ERM assessment is led by our internal ERM function and assesses key risks related to strategies, finances, operations, compliance, personnel and external factors. The ERM approach encourages collaborative and constructive communication, facilitates effective tracking, testing, planning and goal setting for key risks and enhances preparedness for senior leaders and the Board in addressing emerging risks and opportunities. In 2024, the ERM program included consideration of risks in six distinct risk categories and seventeen key risks overall. Each key risk has an Executive Leader assigned as the risk owner, and each risk deemed to be the highest risk receives additional ongoing oversight.

Both the Audit and Finance Committee and the Board review the results of the annual ERM assessment. During the reviews, Avantor's Senior Director of ERM, partnering with each Executive Leader risk owner, presents the results of the ERM assessment in a manner designed to provide full visibility into the risks facing Avantor and how management is mitigating those risks, thereby enabling the Board to effectively exercise its oversight function. To facilitate continued monitoring and oversight by the Board, key risk areas identified during the ERM process and management's associated mitigation activities become part of Board and/or committee meeting agendas for the following year.

88.    The above statements in ¶¶ 60–87 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) Avantor had severely underinvested in its supply chain infrastructure, inventory management systems, and customer services; (ii) Avantor's paltry investments in these systems caused order delays and partial order fulfillments of the Company's lab products for key customers; (iii) as a result of the issues related to the lack of proper investments, the Company experienced customer attrition and loss of market share to competitors; (iv) Avantor significantly overstated the goodwill assigned to its VWR acquisition; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

*The Truth Begins to Emerge*

89.    On April 25, 2025, the truth began to emerge regarding Avantor's supply chain failures and customer defections. In the Company's Form 10-Q filing with the SEC discussing the financial results for the Company's first quarter of fiscal year 2025, the Company reported a weak quarter and cut its full-year financial forecasts. During the 1Q25 Earnings Call, Defendant Stubblefield indicated that Avantor was taking "immediate" efforts to retain key accounts, including "improving data accuracy, accelerating fulfillment speeds and optimizing inventory." The Company also issued the 1Q25 Press Release, which quoted Defendant Stubblefield as stating that the Company was "implementing a comprehensive strategy to strengthen our Lab Solutions segment and are committed to moving with urgency to improve performance across the business." On that same day, the Company announced that Defendant Stubblefield would resign as CEO of Avantor effective upon the appointment of his successor.

90.    On this news, the Company's stock price fell $2.57 per share, or approximately 16.6%, from a closing price of $15.50 per share on April 24, 2025, to a closing price of $12.93 per share on April 25, 2025.

91.    However, following this news, Individual Defendants continued to defraud investors by failing to disclose that the Company had severely underinvested in its supply chain infrastructure, inventory management systems, and customer services, leading to significant customer defections to competitors.

92.    On May 13, 2025, representatives of Avantor participated in the Bank of America Global Healthcare Conference (the "2025 Bank of America Conference"). During the 2025 Bank of America Conference, Defendant Stubblefield discussed how the supply chain and customer reliability for the Company was strong, stating, in relevant part:

I think to start, what I'd just reiterate is just our confidence in the strength and resilience of our platform. I think about our Lab Solutions segment, *we have differentiated capabilities, a broad and expanding portfolio and a supply chain that enables us to serve more than 300,000 customers reliably around the world*. In our Bioscience Production segment, we have a leading bioprocessing franchise and we are the leading supplier of medical grade silicone formulations . . . .

Quite a number of actions that have been in-flight now for a couple of quarters around *differentiated supply chain performance, expanding our portfolio with innovative new partners as well as investments in our digital capabilities and pricing*. Those will certainly improve the top line as we move forward. And we highlighted some incremental cost actions that we've identified that will play out over the next several years.

93.     On August 1, 2025, the Company again disclosed disappointing results in its Form 10-Q filed with the SEC for the second quarter of fiscal year 2025 (the "2Q25 10-Q"). The 2Q25 10-Q reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at *$5,762.2 million* as of June 30, 2025.

94.     On the 2Q25 Earnings Call held that same day, Defendant Jones discussed the Company's reduced 2025 guidance and year-over-year decrease in net sales, attributing it to "increased competitive intensity." The Company also admitted that maintenance overruns and subsequent facility downtime at several plants compounded by raw material availability and equipment uptime issues forced the Company to defer shipments into the second half of the quarter, with recovery over multiple quarters, in some cases more than doubling the order-to-delivery cycle for customers. Avantor also stated that it did not expect the competitive environment to materially improve in the remainder of 2025 and that its weak performance would likely continue.

95.     On this news, the Company's stock price fell $2.08 per share, or approximately 15.5%, from a closing price of $13.44 per share on July 31, 2025, to a closing price of $11.36 per share on August 1, 2025.

96.     The statements contained in ¶¶ 89, 92–93 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) Avantor had severely underinvested in its supply chain infrastructure, inventory management systems, and customer services; (ii) Avantor's paltry investments in these systems caused order delays and partial order fulfillments of the Company's lab products for key customers; (iii) as a result of the issues related to the lack of proper investments, the Company experienced customer attrition and loss of market share to competitors; (iv) Avantor significantly overstated the goodwill assigned to its VWR acquisition; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth is Fully Revealed

97.     The truth was fully revealed on October 29, 2025, when the Company filed its Form 10-Q with the SEC discussing the Company's financial results for the third quarter of fiscal year 2025 (the "3Q25 10-Q"). The 3Q25 10-Q reported a weak third quarter of 2025 and financial results, including a net loss of $712 million, which was attributed to a non-cash goodwill impairment of $785 million. During the 3Q25 Earnings Call held that same day, Defendant Jones disclosed that Avantor had faced a decline in organic revenue primarily related to "operational headwinds that are impacting our throughput, including raw material availability and equipment uptime." The Company also admitted that inventory challenges were caused by a need to improve data accuracy, fulfillment speed, and on-time performance, and that Avantor would undertake plant upgrades to address reliability at aging sites.

98.     During the 3Q25 Earnings Call, Defendant Jones also revealed that the large impairment charge was "associated with our Lab distribution business," the largest portion of the LS segment, and "was necessitated in large part by the continued weakness in our share price as

well as the margin headwinds this business is facing." Jones also admitted that the Company's "margin headwinds" included competitive challenges that had "pressured [the Company's] ability to get price, which has meaningfully impacted margins year-over-year." Moreover, Defendant Ligner, the new President and CEO of Avantor, revealed in the 3Q25 Earnings Call that Avantor had "lost a couple of large accounts." Defendant Jones likewise admitted that "we're seeing the impact of the contract losses on share there, and that "[i]t will take time both on the defense and the new contract wins to see those come in there."

99.    On this news, the Company's stock price fell $3.50 per share, or approximately 23.2%, from a closing price of $15.08 per share on October 28, 2025, to a closing price of $11.58 per share on October 29, 2025.

***Insider Sales***

100.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Eck sold substantial portions of Company common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

101.    While the Company's stock price was artificially inflated, Defendant Eck sold approximately 16,626 shares of Avantor common stock, totaling proceeds of approximately $325,955. Almeida made the following sales of Avantor stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| March 8, 2024 | 3,685 | $25.63 | $94,446.55 |
| September 5, 2024 | 3,525 | $25.06 | $88,336.50 |
| February 26, 2025 | 4,907 | $17.53 | $86,019.71 |
| February 27, 2025 | 1,033 | $17.00 | $17,561.00 |
| August 5, 2025 | 3,476 | $11.39 | $39,591.64 |

102.    As a result of these insider sales, Defendant Eck was unjustly enriched.

*Harm to the Company*

103.    As a direct and proximate result of the Individual Defendants' misconduct, Avantor has lost and expended, and will lose and expend, millions of dollars.

104.    Such expenditures include, but are not limited to: (i) the legal fees associated with the Securities Class Action filed against the Company and Defendants Stubblefield, Jones, Peacock, and Eck, and amounts paid to outside lawyers, accountants, and investigators in connection therewith; (ii) the significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company; and (iii) the costs associated with correcting and remediating the issues attributed to the Company's supply chain issues, overstatement of goodwill, and customer attrition.

105.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

106.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

107.    Plaintiff will adequately and fairly represent the interests of Avantor and its shareholders in enforcing and prosecuting its rights.

108.    Avantor is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

109.    Plaintiff is a current shareholder of Avantor and has been a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

110.    A pre-suit demand on the Board of Avantor is futile and, therefore, excused.  At the time this action was commenced, the twelve-person Board consisted of Individual Defendants Summe, Andres, Carethers, Kang, Ligner, Makin, Massaro, Murthy, and Severino (the "Director Defendants") as well as non-parties Simon Dingemans, Gregory T. Lucier, and Sanjeev Mehra (collectively, with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that six of the Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

111.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

112.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

113.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

114.    As members of the Board charged with overseeing the Company's affairs, each of

the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Avantor, the Director Defendants knew, or should have known, the material facts surrounding Avantor's financial condition and internal control mechanisms.

115. Defendant Ligner is neither disinterested nor independent. In addition to being a director, Defendant Ligner serves as President and CEO of Avantor. Thus, the Company admits that Defendant Ligner is a non-independent director.

116. Director Defendants Summe, Andres, Carethers, Kang, Makin, Massaro, Murthy, and Severino each signed the 2024 10-K.

117. Moreover, Director Defendants Andres, Carethers, Kang, Massaro, Murthy, Severino, and Summe each solicited the 2024 Proxy, which led to the reelection of Defendants Andres, Carethers, Kang, Massaro, Murthy, Peacock, Severino, Stubblefield, and Summe to the Board, allowing them to continue breaching their fiduciary duties to the Company.

118. Director Defendants Andres, Carethers, Kang, Makin, Massaro, Murthy, Severino, and Summe each solicited the 2025 Proxy, which led to the reelection of Defendants Andres, Carethers, Kang, Makin, Massaro, Murthy, Peacock, Severino, Stubblefield, and Summe to the Board, allowing them to continue breaching their fiduciary duties to the Company.

119. Accordingly, all of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore excused.

120. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

121.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

122.    The Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

123.    Director Defendants Andres, Makin, Massaro, and Murthy (the "Audit Defendants") serve on the Company's Audit and Finance Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

124.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the

Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

125.     Accordingly, a pre-suit demand on the Board is futile and excused.

**COUNT I**
**Against the Individual Defendants for Violations of § 14(a) of the**
**Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

126.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.     The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

128.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

129.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

130.     The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy and 2025 Proxy (collectively, the "Proxy Statements"), which were filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because they failed to disclose that, *inter alia*, (i) the Board and company management were not effectively overseeing risks to

the Company, including risks associated with the Company's financial and public reporting; and (ii) the Company's Audit and Finance Committee was not fulfilling its responsibilities with respect to oversight and financial reporting.

131.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Individual Defendants.

132.    The materially false and misleading statements contained in the 2024 Proxy improperly induced shareholders to vote for the reelection of Defendants Andres, Carethers, Kang, Massaro, Murthy, Peacock, Severino, Stubblefield, and Summe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

133.    The materially false and misleading statements contained in the 2025 Proxy improperly induced shareholders to vote for the reelection of Defendants Andres, Carethers, Kang, Makin, Massaro, Murthy, Peacock, Severino, Stubblefield, and Summe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

134.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy Statements.

135.    Plaintiff, on behalf of Avantor, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

138. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

139. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) Avantor had severely underinvested in its supply chain infrastructure, inventory management systems, and customer services; (ii) Avantor's paltry investments in these systems caused order delays and partial order fulfillments of the Company's lab products for key customers; (iii) as a result of the issues related to the lack of proper investments, the Company experienced customer attrition and loss of market share to competitors; (iv) Avantor significantly overstated the goodwill assigned to its VWR acquisition; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result, the Company's public statements regarding its business, operations, and prospects were

materially false and misleading and lacked a reasonable basis at all relevant times.

141.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

142.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

143.    Additionally, Defendant Eck engaged in insider sales during the Relevant Period while the price of Avantor stock was artificially inflated, netting hundreds of thousands of dollars in proceeds for himself.

144.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

145.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

146.    Plaintiff, on behalf of Avantor, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

149.    Plaintiff on behalf of Avantor has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Avantor.

152.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Avantor that was tied to the performance or artificially inflated valuation of Avantor, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

153.    Plaintiff, as a shareholder and representative of Avantor, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other

compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

154.    Plaintiff on behalf of Avantor has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

155.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

157.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*, paying and colleting excessive compensation and bonuses, and incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

158.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

159.    Plaintiff, on behalf Avantor, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and

all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Directing Avantor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein;

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all claims set forth herein.

DATED: February 6, 2026                    **RIGRODSKY LAW, P.A.**

By:  _/s/ Gina M. Serra_
Gina M. Serra
1007 North Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Email: gms@rl-legal.com

Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (516) 683-3516
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Attorneys for Plaintiff*